Good morning, Your Honors. May it please the Court, Kara DeVito for Appellant Antonio Roberts. Your Honors, before I begin arguing, I need to correct a misstatement I made in the reply brief, for which I apologize. On page 9 of the reply brief, I had been discussing the language Mr. Roberts used at the time he attempted to invoke his right to an attorney, and I said he wrote I wrote in one place, he said, well, I think I want a lawyer. And instead, throughout the rest of the briefs, and clearly reflected in the Court of Appeals opinion, what he said was, well, I think I need a lawyer. In Dickerson v. United States, which is the case that clarified Miranda establishes a constitutional rule, the High Court said, at page 443, that Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture. And it strikes me that the issue we're addressing today is, on one hand, how much does that embedded idea in national culture mean that Mr. Roberts did not require re-advisement of his Miranda rights? And conversely, how much does it mean that as a matter of routine police practice, Reyes should have known that he needed to re-advise Mr. Roberts of those rights? In addition, the invocation issue seems to be intertwined with the re-advisement issue, because at the time that Mr. Roberts attempted to invoke his right to an attorney, Reyes's response to it was, this is an equivocal invocation. I need to clarify what he's asking for. And at that point, Reyes failed to re-advise him. And as the Court is probably aware, the rough colloquy between them was Mr. Roberts said, I don't want to testify, with reference to the preliminary hearing of his – of the men he had plotted this robbery with. And Reyes said, well, why? And Mr. Roberts replied, well, I think I need a lawyer. And instead of stopping and advising Mr. Roberts of his Miranda rights, and instead of clarifying whether he was indeed invoking a right to an attorney, Reyes began questioning him. And Mr. Roberts replied, well, I was more involved than I previously revealed. And that's when Reyes began asking, what do you mean by more involved? How closely are we to cut this? I'm sorry. In the invocation of the right to counsel. How thin a line are we drawing here? Your Honor, I wanted to make this two discrete issues. And when I wrote the open brief, I think I phrased it that way. Yeah. But I was reading Davis last night, which is not the seminal case, but the most   In the case of Episode 60, the Court says, We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects, who because of fear, intimidation, lack of linguistic skills, or a variety of other reasons will not clearly articulate their right to counsel, although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves. Ellipsis. And then the Court says, A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. And so from the officer's perspective, Mr. Reyes, it was custodial because your client happened to have been arrested before for a different crime. But Reyes had been dealing with him for some months, not as a suspect or someone who would have been in custody. And this particular visit, as I recall, was occasioned because he went to serve a subpoena. If the client hadn't been arrested for the other crime, they would have gone to his house to serve the subpoena. So this is much more in the nature of a conversation, it seems to me, between the two of them than something that would be categorized as custodial interrogation. The custody was sort of irrelevant to the discussion. Possibly, Your Honor, but before Reyes spoke to Mr. Roberts, he spoke to the deputy sheriff who had arrested him and Mirandized him the night before in connection with the other offense. And Reyes did learn from that peace officer that Mr. Roberts had waived his Miranda rights with respect to that other offense the night before. And so it appears that Reyes was aware this was a custody situation. I mean, clearly my client was in jail at the time. And he did inform himself of whether or not the client had recently been advised of Miranda and recently waived those rights. But from Reyes's perspective, was your client a suspect until it was your client who said, well, I was a little more involved than I told you before. And I think the natural reaction there would be to say not, uh-oh, you better not talk to me, you need a lawyer. Leaving aside the police officer's motivation would be, well, what do you mean? Because for the past several months, we've been dealing with you, and you've been helping you out in these other things, and you're our main witness. And now you're telling me you're the guy. What's going on here? Is that really the occasion for treating him as if he was being arrested and brought into custody at that moment? Well, I completely agree that until that moment, Reyes had no reason to believe Mr. Roberts was anything other than a suspect. But he certainly knew that Mr. Roberts was involved in that robbery, which became a robbery murder, because Mr. Roberts had told him that all along. I was privy to the pre-planning stage. And when Mr. Roberts said, I don't want to testify, Reyes was within his rights to say, well, why not? But then Mr. Roberts said, I think I need a lawyer. And then he said, I'm more involved than I previously revealed. Seems to me that a reasonable police officer should have understood at that moment that he was about to hear a confession. In fact, I suspect Reyes understood he was about to hear a confession, and that's why he didn't re-Mirandize Mr. Roberts. Well, he had been Mirandized the day before, correct? Correct, Your Honor. And don't we have some precedent that deals with a multi-factor test, which you haven't yet addressed in your argument, for when someone who's gotten Miranda warnings needs to be given them again because they're stale? In other words, whether the warnings given the prior day are stale and inapplicable seems to me a central issue in this case, at least apart from the request, whether it was a request that's unequivocal or not, those are really, to me, distinct analytical issues. And the first issue, which I really would appreciate hearing your position on, is under our precedent, why should this be either stale or not stale, prior warning? Your Honor. Because you haven't yet, in your argument, addressed that precedent. I'm not sure which precedent you're referring to. Did I not raise it in my briefs, or did I not raise it today? You may have raised it in your briefs, but in your argument today, I don't have a specific case in mind. I can get to it. But my recollection is we have several precedents that deal with how long it was, whether it was a day before or more than that. And also, OK, time lapse, USB Nordling, which talks about whether there's an appreciable time in between the warnings. And in that case holds that where there were 22 hours in between, in that case there is some precedent on the issue of how long was the time, and was the questioning the prior day on a different crime? And all those things relate to this issue, I think.  No, I agree, Your Honor. My only confusion was whether I had somehow overlooked some case. But in the opening brief at pages 22 to 23, I discussed the concept of the temporal delay. And unfortunately, the case law is across the board on this. There are some cases that talk about a very brief delay requiring re-advisement. There are others that talk about a delay of up to two weeks not requiring re-advisement. And I tried to be even-handed in what I presented to the Court. Under a totality of the circumstances test, however, I think there's more going on here than whether or not the advisement was stale. It was almost a day old, maybe stale, maybe not. But it was in relation to a completely different crime and a category of crime so far less than the robbery murder that went on here, the special circumstances robbery murder. Right. He's talking about a different crime, but I thought there's precedent from the Supreme Court that Miranda's not offense-specific. No. In other words, if the police are investigating one crime and they give someone Miranda warnings, and then they confess to some wholly different thing, it's sort of a so what? They've gotten their warnings. Right. We have less than a minute left. All right. I'm sorry, Your Honor. And by the way, Judge Schroeder, did I address your question about how fine a line are we drawing here by explaining to David Davis? I think I asked him. All right. Thank you. Go ahead. Miranda warnings are not offense-specific, Your Honor. But here we have a young man, and the record does not show that he had been in trouble with the law before, so we don't know whether he's one of those defendants who was being read Miranda rights on any kind of continuous basis in his life and knew how to work the system. What we do know is that he was Mirandized in October and waived his rights. I'm sorry, in February and waived his rights. He was Mirandized on October 24th in relation to a petty offense and waived his rights. And the next day, for whatever reason, out of guilt or fear, he began to talk to a police officer about his involvement in the robbery murder, and he was not re-Mirandized. He attempted to invoke his right to Miranda at that time. He had never before attempted to invoke his right to an attorney. He had waived them the previous two times he'd been advised, and he made what is called an equivocal or ambiguous waiver of those rights. Thank you, Your Honor. May it please the Court, David Glassman for the Respondent. Judge, let me begin by answering your questions. Miranda warnings, according to this Court and other Federal circuits, need not be repeated unless at an appreciable time. That's been the term of art, has elapsed, and Nordling is one case that is cited in our brief. Guam v. De La Pena is another. That involved a 15-hour delay. Antiverdi, a case from this Court, involved a 22-hour delay. But the more important aspect of this case that is not – that was – understandably was not addressed by the Petitioner is that this case comes here in the habeas corpus context in which this issue has been reviewed by a State trial court and a State appellate court. So we would – to give relief, we have to – we would have to conclude that the application of the standards determined by the Supreme Court are objectively unreasonable. That is correct, Your Honor. And I don't believe that there can be any claim in this case, certainly, for example, that any of the State courts addressing it, either the trial court or the intermediate appellate court, got the law wrong, as it were. Both courts applied correctly a fatality of the circumstances analysis, and that analysis took into consideration the fact that from February of October of 1994, this detective had an ongoing relationship with a person known to him to be – or ostensibly to be a witness to a murder, and that there were numerous conversations between them. There was an unquestionably valid Miranda waiver in the first instance, and as I say, there followed from that a longstanding relationship in which they were regularly in touch with each other and in which it was contemplated and understood that Antonio Roberts would perpetrators of this robbery murder. And the testimony is also clear that when the detective walks into that jail room in October of 1994, he has every intention of providing this defendant now, then a witness, with a subpoena to testify in the case against the alleged perpetrators, at which point, he says, he is taken by surprise by Roberts' remarks, and he responds accordingly. The lower court, that is the State trial court, made a factual finding in that regard as to his intention, his state of mind, and that scenario, that dialogue. And I should point out in terms of corrections to the record, it's also stated in the reply brief that the statement is simply, I think I need a lawyer. Now, if that were merely the statement under the case that I cited, Burkett v. Angelone, that has been deemed specifically, that exact statement has been deemed an equivocal statement regarding a desire for counsel. What is that case, Burkett? Burkett v. Angelone. Which case is that? That is a Fourth Circuit case. However, more importantly, Judge Gould, I also pointed out correctly, not incorrectly as the reply brief alleges, that there is a second statement where the statement  is, well, I think I need a lawyer, and there's, well, maybe I need a lawyer. That's correct. And the latter, Judge Gould, is significant. Now, of course, my argument is that you get to the same place in either event, because we know from Davis v. United States that it must be an unequivocal assertion of the right to counsel. Well, let's assume that he said, well, I think I need a lawyer. And how do you deal with Davis? What's the government's best response to the argument that not giving him a lawyer when he says, well, I think I need a lawyer, is an objectively unreasonable application of Davis? My best response is that that's not all that he said. And I just want to finalize that point, Your Honor, because I am, and I, if I can just make a couple of additional citations, in the supplemental excerpts at 23, the lawyer, correction, I think I need a lawyer. In the supplemental excerpts at 78, the federal magistrate says the statements are both in the trial record at 126 and 130 and 147. We have statements and a finding that both statements are made. But let me get to your point. As to whether or not the statement, I think I need a lawyer, is good enough. We have Davis v. United States, which says that the assertion of the right to counsel in these circumstances must be unequivocal, and it must be specific. And according to the Supreme Court, the statement there, well, maybe I need a lawyer, is not an unequivocal statement. Is that what we're forced to do, is to take these, I think, I might, I want, I need, to parse these words? Isn't there anything that is helpful in the Supreme Court's cases in terms of looking at the context? Absolutely, Judge Schroeder. But the context of this case requires me to return to my initial point. And that is, we are allowed to consider exactly what, for example, the State Appellate Court said it was considering, which is the totality of these circumstances. So the question is, at the end of the day, under Supreme Court precedent, that I would submit certainly favors the respondent in this situation. But regardless, under Supreme Court precedent, was it objectively unreasonable for the trial court and the appellate court to decide that based on this totality of circumstances, this, the conclusion of the trial court was clearly contrary to established Federal law. And I submit that that interpretation is not reasonable, particularly in light of Davis versus the United States. I would also point out, and I should have, frankly, expanded my excerpts in this regard, because I could have provided the court with the suppression hearing, although the entire transcript in the trial is relatively brief. You didn't look at the whole record, so you can cite anything you want. Judge Gould, I would direct the court in particular to the findings made by the State Trial Court at the end of the hearing. Because the judge there, over several pages, reviews his interpretation of the evidence, which of course involves necessarily factual findings, including the finding that the statement includes the term, maybe I need a lawyer. And finds that under those circumstances, and in light of the relationship between this witness and the detective, that in his view, Miranda warnings were not required. Was there anything, is there anything in the record in the findings about the inflection or tone of voice? I understand there's total circumstances, but. I don't recall. They stressed I need. They stressed think it might sound more equivocal. And if they stressed need it might sound more unequivocal. But we don't have anything. Unfortunately, Judge Gould, I don't know if the record, it gets that good. But what we do have is a particularly extensive statement by the trial court that I would commend to this court. And before concluding, I would also add that if we do turn to harmless error, although I don't think that's necessary in this case, this petitioner's case is undermined, not so much by his eventual partially accurate statement. But by the evidence of various other witnesses placing him. The other three or whatever turned on him, right? Not only that, but what was more problematic for him is that his scenario is fundamentally inconsistent with the physical evidence in the case, Judge Gould. In other words, by any of his scenarios, one doesn't understand, even if we give him the fingerprints on the jewelry case that was smashed, his fingerprints are also in the getaway car. So that is problematic, to say the least. And finally, the testimony against him was not merely the accomplices and not merely others to whom he made admissions, but also the testimony of the guard who observed him literally acting out the crime while he was in custody for the gratification of a fellow inmate. And I think under that evidentiary record, the worst we could say is that admission of the statement was a harmless error under Brecht v. Abrahamsen. Thank you. Thank you very much. Our hearing is submitted for decision. We'll hear the next case.
judges: Schroeder, Gould, Clifton